1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                  CENTRAL DISTRICT OF CALIFORNIA
10
11   CITY OF BANNING,                    Case No.  ED CV 12-00043 BRO (SPx)
12                   Plaintiff,          **FINDINGS OF FACT AND
                                         CONCLUSIONS OF LAW AFTER
13   v.                                  COURT TRIAL**
14   MARY ANN DUREAU, et al.,
15                   Defendants.
16
17                              **I.**
18                        **INTRODUCTION**
19        On January 9, 2012, Plaintiff City of Banning ("Banning") filed a complaint for
20   damages, alleging, among other things, a violation of the Comprehensive
21   Environmental Response Compensation and Liability Act of 1980 ("CERCLA").
22   (Dkt. No. 1.)  The court has federal question jurisdiction pursuant to 42 USC section
23   9601 et seq.. There is no right to a jury trial in a private party CERCLA cost recovery
24   action, for such relief is equitable in nature. *Hatco v. W.R. Grace*, 59 F.3d 400, 412-
25   414 (3rd Cir. 1995); *U.S. v. N.E. Pharmaceuticals*, 810 F.2d 726, 749 (8th Cir. 1986)
26   Liability under CERCLA is strict, joint and several, *Idaho v. Hanna Mining*, 882 F.2d
27   392 (9th Cir. 1989)
28

1

2          On August 14 through 16 and August 20, 2013, the Court tried the CERCLA

3    matter.  After consideration of the parties' trial briefs, the witnesses and evidence

4    presented by both sides at trial in the case, the Court makes the following Findings of

5    Fact and Conclusions of Law.[1]

6                                          **II.**

7                                 **FINDINGS OF FACT**

8          A. Stipulated Facts

9    Plaintiff and Defendants Mary Ann Dureau and DBBF Enterprises, LLC ("DBBF")

10   (collectively, "Defendants")  stipulated to the following facts which the Court finds as

11   true.

12          1.  Banning is a California government entity.

13          2.  "The Property" consists of four (4) single-story structures located in a

14              commercial/industrial area in the City of Banning, California.

15          3.  For many, many years, The Property has been exclusively used for

16              automotive business purposes.

17          4.  Defendant Douglas James operated DJ's Smog Shop and Automotive

18              on the Property from 2006 until 2009.

19          5.  Though there had been various prior leases regarding the Property, the

20              last such lease ended in 2009, when DJ's Smog Shop vacated the

21              Property; and there has been no tenant on the Property since that time.

22          6.  On July 25, 2011, defaulted Defendant Steven Ryan dumped multiple

23              55-gallon drums containing waste/motor oil, on the Property.

24          7.  At the time of the spill, one of the drums displayed a label stating

25              "DJ's Automotive" and contained a different address than the

26              Property.

27

28   _____

[1] Any finding of fact which constitutes a conclusion of law is hereby adopted as a conclusion of law.

8. At approximately 9:50 a.m. on July 25, 2011, the Banning Police Department, Banning Fire Department and California Department of Fish and Game ("DGF") responded to a hazardous materials spill at the Property.

9. Duane Burk, the City's Public Works Director, contacted HCI Environmental & Engineering Service ("HCI") and requested that it respond to the spill.

10. The City of Banning has incurred necessary costs of responding to the waste spill consistent with the National Contingency Plan in the amount of $592,665, which is the entirety of damages Banning is requesting in this case.

11. The City of Banning has incurred necessary costs of responding to the waste spill consistent with the National Contingency Plan in the amount of $592,665, which is the entirety of the damages Banning seeks from Dureau.

B. Trial Testimony

   *1. Jacqueline Branom Testimony*

Jacqueline Branom worked for Douglas James and his smog shop cleaning bathrooms. She lived at 553 East Ramsey Street, Banning, California ("The Property") and remembers an oil spill.[2] Ms. Branom originally did not have permission from Defendant Mary Ann Dureau to stay on The Property. At one point, Dureau confronted Branom as to why Branom was staying on The Property. Dureau then gave Branom permission to stay on the property as long as she kept the place

---

[2]   It is undisputed that the oil spill occurred on July 25, 2011.

clean.   Branom remained on the property with her boyfriend, Doug, for approximately four months.  She did not know whether other people were staying on the property.

When Mr. James left the property, he left barrels on The Property.  After his departure, Ms. Branom saw people breaking into The Property and stealing copper wire.  On the day of the oil spill, Branom saw the oil barrels.  She also saw two people breaking windows and knocking barrels over with oil spilling out.   Ms. Branom has a history of cocaine abuse.  She was incarcerated in 2010 and has not used drugs since her incarceration.  In 2011, Dureau came onto the property every month or every other month and repaired things.

### 2.  *Mary Ann Dureau Testimony*

Ms. Dureau is a licensed real estate broker.  She learned of the oil spill on August 2, 2011.  Dureau characterized her relationship Theresa Bleul as acquaintances for many years, a contractor who performed work on The Property.  Dureau knew that James would operate a salvage yard, smog and auto repair business, but did not ask whether James had obtained the appropriate permits.  Dureau also knew that the type of business engaged in by James generated waste matter.  James did tell Dureau that he hired a business to clean up waste products from the smog shop.  Yet, Dureau never saw a permit authorizing the disposal of waste material.  Dureau also denies ever giving Branom permission to stay on The Property.

On February 16, 2007, Dureau received a letter from the City of Banning

notifying her of a list of problems on her property, including: (1) an accumulation used tires on her property; (2) broken windows; (3) the metal roof pulling away from the building; (4) cracks and peeling paint; (5) loose wires hanging down; (6) a two-inch gap in the block foundation; (7) the operation of a business without a license. Dureau denied that the paint was peeling or that there were broken windows . Thereafter, Dureau spoke with James about "taking care of the situation." Dureau also hired Theresa Bleul to cure the problems. Dureau did not provide anyone with a bill or invoice for the work completed. Nor does Dureau know whether the City approved the work on The Property.

When James moved out from The Property, Dureau saw a hole in the metal fence. Dureau permitted James a period of time to remove his things but later obtained a restraining order against James. Dureau's lease with James required James to be responsible for any repairs. Banning would frequently send Dureau letters informing of problems and requiring her to fix them. At the time Dureau obtained the restraining order, she saw two to three rusty reddish metal drums on The Property. Dureau had barrels removed from her property a week or two after James left The Property. Dureau admitted that people were putting "junk" on The Property all the time. After James left, Dureau observed mattresses or personal belongings on The Property. Some time before July 2011, Dureau observed persons walking down the street with metal that looked like it came from The Property. Prior to the dumping, Dureau was on The Property in May 2011. At that time, Dureau saw no mattresses on

The Property.  Dureau claims she cleaned up all defects, fixed broken locks, posted a No Trespassing sign, and complained to the police.  Dureau claims she gave a key to the fence on her property to the police. A transient, Steve Ryan, was arrested for the actual dumping; he apologized for the dumping.

On August 2, 2011, Dureau noticed that The Property had been "cannibalized", meaning the buildings were vandalized and items stolen.  Dureau never personally did anything to prevent the release of hazardous materials from The Property.

On August 2, 2013, the day of Dureau's interview with Riverside County Sheriff Detective Fisher, Dureau filed a grant deed deeding The Property to DBBF.

### 3.  Theresa Bluel Testimony

Bluel states that Dureau is her friend and has been so for "quite a long time".  Bluel owned The Property for some period of time, with Dureau holding the note on The Property.  When Bluel ran into financial difficulties, Bluel returned ownership of The Property to Dureau. Dureau forgave the $200,000 note.  At Dureau's request, Bluel cleaned up The Property and performed repairs on The Property, hiring "homeless people" and paying them cash.  She is a licensed contractor, but was not licensed from 2000 to February 2013.  In May 2009, Bluel was present when James left The Property.  She denies seeing Branom on that day.  Bluel did not see any barrels on The Property, but she did not look for barrels.  Bluel painted buildings on The Property, fixed beams, and drywall.  She also threw away mattresses.  Later, Bluel found two empty red barrels.  She claims the barrels were removed two weeks

later.    After James left, Bluel visited The Property every 30 to 60 days.  Frequently, Bluel found evidence of homeless people on The Property.  From the time James left until May 2011, Bluel denies that oil was ever on The Property.

### 4.  Burk Testimony

Banning employs Burk as its Director of Public Works.  He has worked for Banning for 25 years.  All told, on July 25, 2011, four barrels containing 55 gallons were spilled, for a maximum of 220 gallons of oil.  Burke estimates that DJ Smog generated 50 gallons of used oil per month.  After the oil spill, Burk responded to The Property.  The oil spill was the largest in Banning; as a result Banning passed an emergency ordinance creating an incident command.  Because the oil seeped into Banning's storm drain, it was responsible for the cleanup.  The cleanup was completed in accordance with National Contingency Plan. The cleanup protocol required the storm drain to be replaced.  The storm drain emptied into the San Gregornio River.  On July 26, 2011, Burk saw barrels on the Property as depicted in Exhibit 44.  Banning paid $1.8 million to remediate the oil spill.

In 2006 or 2007, Banning created a redevelopment district and acquired certain properties for public use.  The Property is located four parcels away from the acquired property.  In 2006, Banning adopted a new general plan, and implemented a zoning change. The area changed to commercial.   From 2009 to the present, nothing prevented Defendant from seeking a condition use permit for The Property.  In 2011, the governor dissolved the redevelopment agency, thereby stopping any

7.

1  redevelopment.

2         *5. Dong Testimony*

3

4        Mr. Dong is the Vice President and Project Director of SCS Engineers, an

5  environmental consulting firm.  Mr. Dong holds a bachelor degree and a master's

6  degree in environmental engineering from the University of Southern California.  He

7

8  is a registered environmental property assessor and a certified energy auditor.  He has

9  personally worked on the investigation and cleanup of contaminated property

10  hundreds of times.  Based upon his expertise, Mr. Dong opines that $592,665 of the

11  $1.8 million paid by Banning to clean up The Property was necessary and consistent

12

13  with the National Contingency Plan.

14         *6. Chacon Testimony*

15

16        Mr. Chacon works for the City of Banning as a Code Enforcement Officer.

17  Chacon inspected The Property on July 26, 2011, the day after the oil spill.  He took

18  photographs of the structure, looking for municipal code violations.  Chacon identified

19

20  exhibit 37 as one of the photographs he took that day.  Exhibit 37 depicts mattresses,

21  clothing and trash on The Property.  When he inspected The Property, Chacon found

22

23  doors kicked in and makeshift beds in the buildings.  Chacon noted structural

24  deficiencies, cracks in joists, broken windows and trash and debris throughout the

25  property.

26

27         *7. Fisher Testimony*

28        Banning employs Fisher as a police officer, currently assigned to patrol.  He has

been a sworn police officer for 20 years.  And is certified by the Police Officer

Standards and Training ("POST").  In 2011, Fisher was assigned to the detective

bureau, and assigned to investigate the oil spill at The Property.  His investigation

revealed Steven Ryan, a transient, as a person of interest.  Fisher interviewed Ryan.

Ryan first denied spilling the oil.  After Fisher used an investigative ruse, telling Ryan

that video surveillance captured Ryan spilling the oil, Ryan confessed to spilling the

oil.  Ryan stated he spilled the first barrel thinking it was water; he dumped the other

barrels over because he was "just being stupid."  Ryan wrote a letter apologizing for

the spill.  To his knowledge, Ryan was never prosecuted for spilling the oil.

Fisher inspected The Property with Ms. Dureau who pointed out a hole in a wall

of The Property big enough for someone to walk back and forth through.  Fisher

estimated the hole to be about ten feet.  There was tin and wood boarding up the hole.

Dureau told Fisher that she believed that a vehicle belonging to her had been stolen

from The Property.  Dureau told Fisher that James told her (Dureau) that someone was

purchasing his oil.  Dureau also told Fisher that Branom was watching The Property

for her.  Dureau also stated that she provided Branom with money.  Dureau told Fisher

she (Dureau) gave Branom permission to stay on The Property.  Dureau made a

pretext call to James at Fisher's request.

During the pretext call, Fisher denied that his oil was on The Property.  James

blamed the oil spill on transients.  James did admit that he didn't remember leaving

barrels on The Property but he might have done so.  James informed Fisher that James

used the company Safty-Kleen to dispose of the oil.

Fisher later contacted Safety-Kleen representatives who stated that they never picked up any oil from James. The Safety-Kleen representatives informed Fisher that James rented a parts cleaner from Safety-Kleen. James told Fisher that his paperwork was "squared away." Fisher followed up with the State of California's website regarding licensing. Fisher determined that as of 2009, James did not have government permission to dispose of hazardous waste. Fisher disbelieved James about Safety-Kleen and James' permits.

Fisher interviewed Branom who stated that there were barrels of oil on the property and some "white boy from Cabazon" spilled the oil. Branom did not know the name of the person who spilled the oil, but gave Fisher a description. Fisher interviewed Beverly James Banks, who is employed by James. Banks recalled a barrel with James' information on it located on The Property at the time of the spill. Fisher estimates that Ryan spilled approximately 300 gallons of oil.

8. *Green Testimony*

Mr. Green is another Vice President and Project Director of SCS Engineers. Green holds a degree in biology from Long Beach State University and attended graduate courses in geology. He is a professional geologist in the State of California. Green has been involved in dumping site investigations for 27 years. Courts have qualified Green as an expert. Green is familiar with the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) and the

10.

National Contingency Plan.  In his expert opinion there was a "release" of a hazardous substance, as defined by CERCLA, on The Property.  Green reviewed reports analyzing samples taken from The Property.  The samples contained heavy metals and Polyaromatic Hydrocarbons (PAHs).  According to Green, Exhibit 43 depicts 55 gallon drums, with each drum weighing approximately 500 pounds.  Green explained exhibits 15, a site assessment,  and 46, a photograph depicting the flow of hazardous waste for 3,514 feet into the storm drain.  In Green's expert opinion, Banning's remedial actions were consistent with the National Contingency Plan.

### 9.  Steele Testimony

Mr. Steele attempted to rent The Property in June 2009.  During that month, Steele inspected The Property.  He "liked what he saw" when he inspected The Property.  In his opinion, The Property was clean. He did not see any barrels on The Property, but doesn't recall seeing the bermed area where the barrels were photographed after the oil spill.  Steele signed a lease with Dureau on June 15, 2009 and gave her a $5,000 deposit.  Later, Bluel hired Steele to put up plywood on the windows.  When he worked on The Property, everything was unlocked and The Property filled with debris.

### 10.  Kelly Testimony

Mr. Kelly is a police officer employed by Banning and has been so employed for five and one-half years.  Prior to that, Kelly worked for the Riverside County Sheriff's Department.  He is POST certified.  Banning assigned him to respond to the

11.

oil spill on July 25, 2011.  He responded to The Property where he discovered some 55-gallon drums on their side.  Exhibit 43 accurately depicts the drums.

### 11. Vaughn Testimony

Safety-Kleen employs Mr. Vaughn as the branch general manager.  Safety-Kleen did business with DJ's Smog Shop from 2001 until 2009.  Safety-Kleen provided James with a parts washer rental service and washer solution disposal.  During their relationship, James never contracted with Safety-Kleen to dispose of used oil.

### C. Exhibits

Exhibits 40, 41, 42, 43 and 44 show oil barrels on The Property after the oil spill.  Specifically, the barrels are shown in a bermed area.  At least one of the barrels bears the identification, "DJ's Smog Shop" and "Hazardous Waste".

### D. Credibility Determinations

Ninth Circuit Model Jury Instruction 1.11 provides guidance to jurors when assessing credibility.  The factors include:  (1)  the opportunity and ability of the witness to see or hear or know the things testified to;  (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case and any bias or prejudice; (5) whether other evidence contradicted the witness's testimony; (6) the reasonableness of the witness's testimony in light of all the evidence; and, (7) any other factors that bear on believability.  Ninth Cir. Model Jury Instr. 1.11 (Civil) (2007).  The Court finds these factors helpful in assessing the

credibility of the witnesses.

First, witness Jacqueline Branom's testimony is not without inconsistencies. Her memory was, at times, spotty. However, the Court observed her demeanor while testifying. Ms. Branom responded to questions in a straightforward and forthright manner. She was not evasive in any way. Ms. Branom presented as an unbiased witness who simply answered the questions. She held no bias against Dureau. Indeed, on a previous occasion, she believed that the police lied. Ms. Branom's testimony was corroborated by the photographic evidence and testimony of witnesses. Exhibits 40 through 44 show barrels on the property immediately after the oil spill. Officer Kelly interviewed Ms. Banks who corroborated Branom's account that barrels remained on The Property after James' departure. Detective Fisher interviewed Branom and identified Ryan based upon Branom's description. Ryan confessed to spilling the oil. Accordingly, on balance, the Court believes the testimony of Ms. Branom.

In contrast, the Court finds Ms. Dureau's demeanor differed significantly. She refused to answer simply questions, seeking to re-define the question. The Court observed her demeanor and believes Dureau feigned a lack of understanding. Much of Dureau's testimony is not based upon her observations, but rather what she heard. Dureau trial testimony contradicts her previous statements, and that of other witnesses. For example, Dureau denies a friendship with Bluel, yet Bluel characterizes their relationship as friends. Dureau brought Bluel to the interview with

Fisher.  During the interview, as depicted in exhibit 55, Bluel and Dureau interrupt

each other.  Bluel answers for Dureau, indicating a deeper relationship than that

described by Dureau.  Unlike her demeanor during the trial, Dureau was sarcastic and

combative during Fisher's interview.  Unlike other witnesses, Dureau has the greatest

interest in the outcome of this case.  Finally, her testimony is not reasonable given the

other evidence adduced at trial.  She maintains that there were no barrels on The

Property after James' departure, yet immediately after the oil spill, photographs depict

five barrels on The Property.  It is not reasonable to believe that Ryan or anyone else

carried five 55-gallon drums, weighing 500 pounds each onto The Property only to

spill them.  Dureau, a licensed real estate broker and sophisticated owner of

properties, claims that she transferred title to The Property to DBBF well before the

July 25, 2011, but did not transfer title to The Property until August 3, 2011, the day

after Dureau's interview with Fisher.  The Court finds that a sophisticated

businesswoman and real estate broker would have ensured that the title to The

Property passed well before the August 2011 date.  Accordingly, the Court finds

Dureau's testimony not credible.

Bluel, like Dureau, suffers from the same credibility deficit.  She too could not

answer the question simply.  She, no doubt, did make repairs upon The Property, but

she did not possess a contractor's license.  Her longtime friendship with Dureau biases

her in favor of Dureau.  She too denies oil being on The Property after James'

departure.  For the same reasons, this Court finds her testimony not reasonable in light

14.

1    of all the other evidence at trial.

2        The other witnesses who testified at trial were essentially not in dispute and the

3    Court credits their testimony.

4

5                                    III.

6                          CONCLUSIONS OF LAW

7

8    A.    CERCLA CLAIM

9        Per *Carson Harbor Village v. Unocal,* 270 F.3d 863, 870-871 (9th Cir. 2001),

10   the *prima facie* elements of a CERCLA private cost recovery action pursuant to 42

11   U.S.C. section 9607(a) brought in the Ninth Circuit are:

12       **1.    The Property is a "facility":  42 U.S.C. section 9607(a)(1)**

13       42 USC section 9601(9) defines "facility" as:
         (A) any building, structure, installation, equipment, pipe or
14       pipeline (including any pipe into a sewer or publicly owned
         treatment works), well, pit, pond, lagoon, impoundment,
15       ditch, landfill, storage container, motor vehicle, rolling
         stock, or aircraft, or
16       (B) any site or area where a hazardous substance has been
         deposited, stored, disposed of, or placed, or otherwise come
17       to be located; but does not include any consumer product in
         consumer use or any vessel.
18

19       The drums of oil were located within the berm of a building on The Property.

20   Thus, it is a "structure," and "an area where a hazardous substance has come to be

21   located."  As a result, the Court finds that The Property was a "facility" within the

22   meaning of CERCLA.

23       **2.    "Hazardous substances" stored at the facility were "released"**

24       **into the environment:  42 U.S.C. section 9607(a)(4)**

25       Kevin Green testified that in his expert opinion, a "release" of "hazardous

26   substances" occurred on July 25, 2011. (Dkt. 249, 8/16/13 at p. 613.)  He reviewed

27   reports of samples taken from The Property finding that the waste materials in the four

28

                                    15.

1  drums contained several chemicals in a class called "polynuclear aromatic

2  hydrocarbons" ("PAHs") and several metals. (Dkt. 249, 8/16/13 at p. 614.)  Both

3  PAHs and heavy metals falls within the definition of a  "hazardous substance" in 40

4  CFR section 302.4.  Therefore, "hazardous substances" within the meaning of

5  CERCLA.

6        In Green's opinion, dumping the contents of four drums onto the Property on or

7  about July 25, 2011 and allowing the hazardous substances to flow off site into storm

8  drains constituted a "release" of such hazardous substances. 42 U.S.C. section

9  9607(a)(4). (Dkt. 249, 8/16/13 at p. 614.)

10        **3.    Plaintiff incurred response costs "necessary" and consistent**

11              **with the National Contingency Plan, 40 CFR section 300 et seq**

12              **("NCP"):**

13        Both Green and Dong qualified as experts and testified regarding whether

14  Banning's response to the spill and the attendant costs were consistent with the

15  National Contingency Plan ("NCP").  According to Fisher and Chacon, the actual

16  response to the spill was overseen by the California Department of Fish and Game,

17  Riverside County Environmental Health, and the City's Department of Public Works,

18  with Banning paying for the costs of response.  Green testified that such response was

19  consistent with the procedures and guidelines set forth in the NCP for the size and

20  type of release at bar. (Dkt 249, 8/16/13 at p. 617.)  However, even though the

21  response was consistent with NCP protocol, Dong testified, and the parties stipulated,

22  that of the approximately $1.8 million the City spent on responding to the release,

23  only $592,665.00 was "necessary."  Accordingly, the amount of response costs

24  recoverable by the City under CERCLA is $592,665. (Dkt. 247, 8/15/13 at p. 372.)

25        **4.    Defendants are in one or more classes of liable parties under 42**

26              **U.S.C. section 9607(a):**

27        42 U.S.C section 9607(a) states, *inter alia*, that the following persons are liable

28  under CERCLA:

16.

1   (1) the owner and operator of a vessel or a facility, and

2   (2) any person who at the time of disposal of any hazardous substance owned or

3   operated any facility at which such hazardous substances were disposed of.

4   The Court finds that Defendant Dureau owned and operated The Property on

5   July 25, 2011, the day of the spill.  She did not transfer title of The Property  to DBBF

6   until August 3, 2011.  As a result, Dureau is a liable party under CERCLA.  Because

7   Defendant DBBF did not own or operate the Property on July 25, 2011, DBBF is not a

8   liable party under CERCLA.

9   **5.     Defendant's Defense Pursuant To 42 U.S.C. § 9607 (b)(3)**

10   In defense, Defendant Dureau raises the "innocent landowner

11   defense" codified at 42 U.S.C. section 9607(b).  Section 9607(b) states,

12   in relevant part:

13   

14   "(b) Defenses

15   There shall be no liability under subsection (a) of this
section for a person otherwise liable who can establish by a
preponderance of the evidence that the release or threat of

16   release of a hazardous substance and the damages resulting
therefrom were caused solely by—…

17   

18   (3) an act or omission of a third party other than an
employee or agent of the defendant, or than one whose act

19   or omission occurs in connection with a contractual
relationship, existing directly or indirectly, with the

20   defendant (except where the sole contractual arrangement
arises from a published tariff and acceptance for carriage by

21   a common carrier by rail), if the defendant establishes by a
preponderance of the evidence that (a) he exercised due care

22   with respect to the hazardous substance concerned, taking

23   into consideration the characteristics of such hazardous
substance, in light of all relevant facts and circumstances,

24   and (b) he took precautions against foreseeable acts or

25   omissions of any such third party and the consequences that
could foreseeably result from such acts or omissions.

26   

27   

28   

17.

Defendant Dureau failed to show by a preponderance of the evidence that she exercised due care relating to the waste material.  Despite knowing of constant transient break-ins, she permitted the oil to remain in the drums on The Property after DJ's Smog Shop left.  Despite knowledge of repeated violations, she visited The Property infrequently.  She permitted the oil drums to remain on vacant, inadequately secured, property for a lengthy period of time.  She also did not seek permits to store such waste, nor require such permits from her tenants.  She was largely an absentee landlord who knew of the problems on The Property based upon repeated notice from Banning.  It was reasonably foreseeable that an inadequately secured property would invite transients to occupy it, and that transients may cause the waste materials in the drums thereon to be spilled, with the waste material flowing into the storm drain.

## B.  COUNTERCLAIM:  EQUITABLE INDEMNITY

In order to state a claim for equitable indemnity, Defendants must show:

(a) Defendants are liable in this case; and,

(b) Banning's City's own negligence is responsible for causing some of the damages that are being claimed against Defendants.

*See* CACI 3800. <u>AMA v. Sup Ct.</u>, 20 Cal 3d. 578 (1978); Cal. Civil Code § 1431.2.

## C.  COUNTERCLAIM: CONTRIBUTION

In order to state a claim for contribution, Defendants must show:

(a) Defendants are liable in this case; and,

(b) Banning is responsible for causing some of the damages that are being claimed against Defendants.

33 U.S.C. § 2709; 43 U.S.C. § 113 (F); Cal Civ. Code § 1432.

## D.    COUNTERCLAIM: DECLARATORY RELIEF

Defendants' claim for declaratory relief shares similar elements: In order to WHETHER, Defendants are assessed liability in this case.  Defendants must prove:

(a) Defendants are liable in this case; and,

18.

> > (b) Banning is responsible for causing some of the damages that are
> > being claimed against Defendants.

33 U.S.C. § 2709; 43 U.S.C. § 113 (F); Cal Civ. Code § 1432.

In this case, the first three counterclaims require the same elements. First, as detailed above, the Court has found Defendant Dureau liable in this case. The second element centers on Banning's negligence and/or responsibility for causing some of the damage. The Court finds Banning was not negligent and did not cause any portion of the damages in this case. Banning repeatedly sent letters to Dureau of clean up the violation on The Property. Banning did not permit homeless persons to vandalize The Property. Banning sought permission to prosecute trespassers on The Property. Banning was not obligated by taking a key, which they later returned, to look after the The Property. The Court rejects the testimony of Dureau that she was informed that police officers permitted Branom to remain on The Property without permission. Chacon testified that he sent a letter to Dureau regarding multiple violations. (Dkt. 247, 8/15/13 at p. 407.) Moreover, Banning does not fall within the defined categories of persons liable for an CERCLA violation. Accordingly, the Court rejects Counterclaimant Dureau's request for contribution or equitable indemnity.

## E.    COUNTERCLAIM: INVERSE CONDEMNATION

In order to state a claim for inverse condemnation, Defendants must show:

> > (a) Defendants/Counterclaimants own private property;

> > (b) Banning took or damaged the property; and,

> > (c) Compensation to the owner.

Cal Const., art 1, Sec 14; *Klopping v. City of Whittier*, 8 Cal. 3d 39 (1972); 3 Witkin, Summary of Cal. Law (7th ed. 1960) Constitutional Law Sec 223 p. 2033; Rose v. State of California 19 Cal 2d. 713 (1942) (Damages are "just compensation to be measured by the market value of the property at the time of the taking"); Code of Civ. Proc. § 1249.

As detailed above, Dureau owned private property, namely The Property, in this case during the relevant periods.[3]  The next question centers on whether Dureau proved that Banning, though its actions, either engaged in a total or partial "taking" of The Property.  The salient issues are whether Banning intentionally "withheld" business licenses for automotive purposes, lied, and encouraged third parties to trespass upon The Property  and thereby effectively "taking" the use of The Property.  The Court finds that Dureau has failed to meet her burden.  She has not shown that Banning encouraged third parties to trespass on The Property.  Banning did not permit homeless persons to vandalize The Property.  Banning sought permission to prosecute trespassers on The Property.  Nor has Dureau shown that Banning "lied" to Dureau or anyone else, or intentionally withheld business licenses, or intentionally sent Dureau letters regarding municipal code violations in order to harass her.

To the extent Dureau seeks to sustain her burden by showing that Banning's zoning change "took" her property, she must have exhausted her administrative remedies, which she did not.  *See, e.g.*, *Hensler v. City of Glendale*, 8 Cal. 4th 1, 10-11 (1994) (plaintiff must exhaust administrative remedies when challenging government regulation which allegedly "takes" property).  Moreover, Judge Phillips' ruling regarding exhaustion does not apply because Judge Phillips concluded "[h]ere, Dureau challenges neither the denial of a permit not the City's zoning ordinance." (Dkt. 44 at 14.)  In context then, Dureau has not shown that she sought a non-conforming use or sought to "grandfather" her use.  *See Williamson County Regional Planning Commission v. Hamilton Bank of Johnson*, 473 U.S. 172, 188 (1985) ("[R]espondent did not then seek variances that would have allowed it to develop the property according to its proposed plat, notwithstanding the Commission's finding that the plat did not comply with the zoning ordinance and subdivision regulations.")

---

[3] Because DBBF did not acquire title to The Property until August 4, 2011.  DBBF and Dureau have not provided any evidence of Banning's conduct after 2011, thus any claim by DBBF fails.

20.

1   Thus, she has failed to show that she exhausted her administrative remedies with

2   respect to the regulatory taking.

3        Even assuming Dureau exhausted her administrative remedies, she failed to

4   meet her burden.  Because The Property remained economically viable, she has not

5   shown a *per se* taking.  *See*, *e.g.*, *Tahoe Sierra Preservation Council v. Tahoe*

6   *Regional Planning Agency*, 535 U.S. 302, 330 (2002) ("'[C]ompensation is required

7   when a regulation deprives an owner of '*all* economically beneficial uses' of his

8   land.'").  Thus the Court must examine the factors articulated in *Penn Central Trans.*

9   *Co. v. City of New York*, 438 U.S. 104 (1978).  In analyzing such claims, *Penn Central*

10  articulated certain relevant factors:  (1) the economic impact of the regulation; (2) the

11  investment backed expectations; and, (3) the "character" of the invasion by the

12  government.  *Penn Central,* 535 U.S. at 124.

13        In this case, Dureau has failed to show the economic impact of the regulation.

14  She has not attempted to develop The Property in any way.  She sought a lease on one

15  occasion, which was denied.  She did not further attempt to develop The Property.

16  Courts have held that such a diminution in value must be extreme.  *See*, *e.g.*, *Haas v.*

17  *City and County of San Francisco California*, 605 F.2d 1117, 1120 (9th Cir. 1979)

18  (diminution in value from $2,000,000 to $100,000 insufficient to require "just

19  compensation").  Second, Dureau fails to show that her reasonable investment-backed

20  expectations were "taken" by Banning.   She did not attempt to further develop The

21  Property for any other purpose than automotive uses.  Indeed, she never attempted to

22  be "grandfathered" in.  Finally, courts have consistently upheld the use of zoning

23  regulations to promote redevelopment, even where a use of a property is prohibited.

24  *See*, *e.g.*, *Penn Central,* 438 U.S. at 125.  Because Dureau has failed to satisfy this

25  element, the Court will not reach the element of damages.  Therefore, Dureau has

26  failed to meet her burden of proof on the her counterclaim for inverse condemnation.

27

28

1    Judgment is for Plaintiff in the amount of $592,665 against Defendant Dureau.

2    Banning's Complaint against Defendant DBBF is dismissed with prejudice. Dureau

3    and DBBF's counterclaims are dismissed with prejudice.

4

5    **IT IS SO ORDERED.**

6    Dated:  November 18, 2013

7    HONORABLE BEVERLY REID O'CONNELL
     UNITED STATES DISTRICT COURT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28